433 F.2d 174
 UNITED STATES of America
v.
AMERICAN RADIATOR & STANDARD SANITARY CORPORATION, Kohler Co., Crane Co., Wallace-Murray Corporation, Universal-Rundle Corporation, Rheem Manufacturing Company, Borg-Warner Corporation, Briggs Manufacturing Company, Plumbing Fixture Manufacturers Association, Joseph J. Decker, Daniel J. Quinn, Norman R. Held, Robert E. Casner, John B. Balmer, Stanley S. Backner, Robert J. Pierson, Jr., and George W. Kelch.
Appeal of AMERICAN STANDARD, INC., in No. 18182.
Appeal of KOHLER COMPANY, in No. 18183.
Appeal of BORG-WARNER CORPORATION, in No. 18184.
Appeal of Joseph J. DECKER, in No. 18185.
Appeal of Daniel J. QUINN, in No. 18186.
Appeal of Norman R. HELD, in No. 18187.
 United States Court of Appeals, Third Circuit.
 Argued May 21 and May 22, 1970.
 Decided September 23, 1970.
 Rehearing Denied November 3, 1970.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED William E. Willis, Sullivan & Cromwell, New York City (Morris, Safier & Teitelbaum, Pittsburgh, Pa., on the brief), for American Standard, Inc.
 Gilbert J. Helwig, Reed, Smith, Shaw & McClay, Pittsburgh, Pa. (Paul J. Winschel, J. Tomlinson Fort, Pittsburgh, Pa., Lucius P. Chase, Kohler, Wis., on the brief), for Kohler Co.
 
 
 1
 Clayton A. Sweeney, Rodewald, Kyle & Buerger, Buchanan, Ingersoll, Pittsburgh, Pa. (Thomas M. Thompson, Calvin R. Harvey, Pittsburgh, Pa., Charles W. Houchins, Chicago, Ill., on the brief), for Borg-Warner Corp.
 
 
 2
 Frank L. Seamans, Eckert, Seamans & Cherin, Pittsburgh, Pa. (Dale Hershey, Pittsburgh, Pa., on the brief), for Joseph Decker and Daniel Quinn.
 
 
 3
 Alexander Unkovic, Meyer, Unkovic & Scott, Pittsburgh, Pa. (P. Christian Hague, Pittsburgh, Pa., on the brief), for Norman Held.
 
 
 4
 Gregory B. Hovendon, John C. Fricano, Rodney O. Thorson, Attys., Dept. of Justice, Antitrust Division, Washington, D. C. (Richard W. McLaren, Asst. Atty. Gen., W. Richard Haddad, George Edelstein, C. Coleman Bird, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellee.
 
 
 5
 Before SEITZ and ALDISERT, Circuit Judges and HIGGINBOTHAM, District Judge.
 
 OPINION OF THE COURT
 SEITZ, Circuit Judge:
 
 6
 These are appeals from judgments of conviction entered after jury verdicts finding violations of section 1 of the Sherman Act, 15 U.S.C. § 1, by appellants American Radiator & Standard Sanitary, Inc. (American Standard); Joseph J. Decker and Daniel J. Quinn, President and Vice President respectively of American Standard's Plumbing and Heating division; Kohler Co. (Kohler); Norman R. Held, member of Kohler's board of directors and Sales Manager for Plumbing Fixtures; and Borg-Warner Corp. (Borg-Warner).
 
 
 7
 Appellants were indicted on October 6, 1966. Also indicted with appellants were five other plumbing fixture manufacturers, Crane Company (Crane), Universal-Rundle Corp. (Universal-Rundle), Rheem Manufacturing Co. (Rheem), Wallace-Murray Corp. (Wallace-Murray), and Briggs Manufacturing Company (Briggs); five other employees of corporate defendants, Robert E. Casner, Vice-President & General Manager of Crane's Plumbing, Heating, Air Conditioning Group; John B. Balmer, President of Wallace-Murray; Stanley S. Backner, Universal-Rundle's Vice-President for Marketing until December 1963, and Executive Vice-President of the Plumbing Fixtures Manufacturers Association thereafter; Robert J. Pierson, Jr., Vice-President for Marketing of Rheem's Home Products Division; George W. Kelch, President and General Manager of Borg-Warner's Ingersoll-Humphryes Division; and the Plumbing Fixtures Manufacturers Association (PFMA). The one-count indictment charged that from September 1962 until sometime in 1966 the corporate and individual defendants, together with various unindicted co-conspirators, engaged in an unlawful combination and conspiracy consisting of "a continuing agreement, understanding and concert of action * * * to raise, fix, stabilize and maintain the prices of enameled cast iron and vitreous china plumbing fixtures" in violation of section 1 of the Sherman Act. The indictment further stated that:
 
 
 8
 "13. In formulating and effectuating the aforesaid combination and conspiracy, the defendants and co-conspirators did those things which they combined and conspired to do, including, among other things, the following:
 
 
 9
 "(a) Held meetings at various times under the guise of so-called `official' PFMA meetings and during conventions of plumbing fixtures distributors and wholesalers at hotels and clubs, including, among others Greater Pittsburgh Airport Hotel, Pittsburgh, Pennsylvania; Sheraton-Chicago Hotel, Chicago, Illinois; Shoreham Hotel, Washington, D. C.; The Americana of New York, New York, New York; The Waldorf-Astoria, New York, New York; Palm Beach Biltmore Hotel, Palm Beach, Florida; and Chicago Athletic Club, Chicago, Illinois, at which times said defendants and co-conspirators:
 
 
 10
 "(i) agreed to increase prices of enameled cast iron and vitreous china plumbing fixtures;
 
 
 11
 "(ii) agreed to limitations on maximum discounts from published prices of enameled cast iron and vitreous china plumbing fixtures;
 
 
 12
 "(iii) confronted one another with reported deviations from agreed upon maximum discounts and published prices of enameled cast iron and vitreous china plumbing fixtures;
 
 
 13
 "(iv) agreed to discontinue the manufacture of regular enameled cast iron plumbing fixtures which were lower-priced than acid-resistant enameled cast iron plumbing fixtures; and
 
 
 14
 "(v) agreed to seek and to obtain, as part of the agreement to discontinue the manufacture of enameled cast iron plumbing fixtures, the revision of the Enameled Cast Iron Commercial Standard to provide for only acid-resistant enameled cast iron plumbing fixtures;
 
 
 15
 "(b) Published price announcements and price books increasing the prices of enameled cast iron and vitreous china plumbing fixtures in accordance with agreements reached;
 
 
 16
 "(c) Discontinued the manufacture of regular enameled cast iron plumbing fixtures in accordance with the agreements reached;
 
 
 17
 "(d) Telephoned and otherwise contacted one another between meetings concerning:
 
 
 18
 "(i) increased prices on vitreous china plumbing fixtures;
 
 
 19
 "(ii) reported deviations from agreed upon maximum discounts and published prices of enameled cast iron and vitreous china plumbing fixtures; and
 
 
 20
 "(iii) the discontinuation of the manufacture of regular enameled cast iron plumbing fixtures;
 
 
 21
 "(e) Used the office of Secretary of PFMA, among other things, to schedule and arrange for the aforesaid meetings, to maintain a line of communication between said defendants and co-conspirators and to co-ordinate the efforts of said defendants and co-conspirators in seeking and obtaining the revision of the aforesaid Enameled Cast Iron Commercial Standard."
 
 
 22
 The defendants named in the indictment that are not involved in this appeal entered pleas of nolo contendere in the fall of 1968 and were thereafter sentenced. Appellants entered pleas of not guilty, and their sixteen-week jury trial began on January 13, 1969. Their basic theory was that the price moves alleged to be the result of illegal agreements were in fact the result of the operation of ordinary economic forces in the market place. The government called ten witnesses and rested its case on February 19, 1969. Appellants Quinn, Decker, American-Standard, Held and Kohler presented a total of 21 witnesses and rested their cases on April 23, 1969. Appellant Borg-Warner elected not to introduce any testimony of its own although its counsel did cross-examine witnesses and place some exhibits in evidence. The trial transcript consisted of 10,256 pages and more than 900 exhibits were introduced into evidence. The jury retired to deliberate on the afternoon of May 2, 1969, and at 10 p. m. returned guilty verdicts against all six appellants, and they were thereafter sentenced.
 
 
 23
 Appellants have filed a Joint Brief in this court advancing numerous grounds in support of their claim that all their convictions should be reversed. They argue that they were denied a fair trial because of the trial judge's excessive and partisan participation in the trial and by his erroneous evidentiary rulings; that they were substantially prejudiced and denied a fair trial by the improper and inflammatory conduct of the prosecuting attorneys; and that they were prejudiced by the trial judge's procedures in connection with the jury charge, errors in the charge, and the pressured submission of the case to the jury. In addition separate briefs have been filed by all appellants but American Standard. Each advances various individual grounds for reversal. Unlike appellants American Standard and Quinn, appellants Kohler, Held, Borg Warner and Decker argue that because of the weakness of the government's case against them, their motions for judgment of acquittal should have been granted.
 
 
 24
 We will first deal with the arguments raised in appellants' Joint Brief and then examine those raised in the individual briefs. In order to evaluate the claim of appellants Kohler, Held, Borg-Warner and Decker that the evidence against them was insufficient to go to the jury (and to provide some indication of the strength of the government's case against all of the appellants), we will begin our analysis with a review of some of the government's evidence.
 
 THE GOVERNMENT'S CASE
 
 25
 We emphasize at the outset our conclusion that the evidence of an illegal price-fixing conspiracy is compelling. The proof of the conspiracy rests in large part upon the testimony of witnesses who were themselves defendants or executives of defendant corporations. These witnesses described various meetings they attended where price discussions occurred and price-fixing agreements were reached. When this multiple "eyewitness" testimony is considered in light of the largely admitted simultaneous price moves made by the indicted manufacturers, the strength of the government's case becomes apparent.
 
 
 26
 We will discuss in turn the four "phases" of the conspiracy alleged by the government. We note that the government was not required to prove that all the means and methods alleged in the indictment were utilized or that each defendant participated in each phase of the conspiracy or, indeed, that any of the illegal agreements were carried out. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). A conviction against any defendant is warranted if the jury finds beyond a reasonable doubt that the conspiracy alleged in the indictment existed and that the defendant knowingly became a member of the conspiracy, either at its inception or at a later phase of its operation. Moreover, no formal agreement is necessary to constitute an unlawful conspiracy; it is sufficient that a concert of action be contemplated and the defendants conform to the arrangement. "Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). See also Esco Corp. v. United States, 340 F.2d 1000 (9th Cir. 1965).
 
 
 October-November 1962 Enameled Cast Iron Bathtub Price Increase
 
 
 27
 It is undisputed that, with the exception of Borg-Warner, all the indicted corporations published identical increased prices on special truckload and carload "discount prices" on certain high volume enameled cast iron bathtubs in October and November 1962. Although Borg-Warner did not issue a printed sheet, there was evidence that it "published" similar price increases on the bathtubs in question by a series of telephone calls made in October to sales representatives around the country, each of whom communicated the prices to wholesale distributors. We think the evidence would support a jury finding that these bathtub price increases were the direct result of an agreement reached at a meeting of the indicted corporations' sales officials held in appellant Quinn's room at the Sheraton-Chicago Hotel on September 17, 1962, the evening before a regularly scheduled PFMA meeting.
 
 
 28
 There was evidence that the following persons were present at this September 17 gathering in Quinn's room: appellant Quinn (American Standard), appellant Held (Kohler), defendant Kelch (Borg-Warner), defendant Casner (Crane), defendant Backner (Universal Rundle), Charles J. Callanan, Jr., a Rheem executive and its representative to the PFMA, and J. V. Cannon, Director of Marketing of the Eljer Division of Wallace-Murray. There was substantial "eyewitness" testimony concerning price discussions and agreements at this gathering. For example, the government's first witness, Callanan (Rheem), testified that he attended this September 17 gathering in Quinn's room and that specific prices for bathtubs in question were discussed there. He further testified that when he left the meeting he knew what the price increases would be:
 
 
 29
 "Q. The question, Mr. Callanan, was: What was decided with respect to the specific increased prices on bathtubs in that room?"
 
 
 30
 "The Court: If anything.
 
 
 31
 "The Witness: The prices as reflected in my bulletin of November 2, 1962 [Rheem's published discount prices], were the prices that I came out of that room with that understanding."
 
 
 32
 These prices were the identical prices adopted by all the other indicted manufacturers. Moreover, although Callanan could not recall specific statements by each attendee concerning the bathtub price increase, he did testify that defendant Kelch (Borg-Warner) participated in price discussions and that appellant Held (Kohler) "was there listening" to them.
 
 
 33
 Cannon (Wallace-Murray) also testified that he was present at the meeting in Quinn's room and that prices for the bathtubs in question were discussed there. He further stated that when he returned to Pittsburgh he reported the price discussions to his superior, Loren H. Bonnett, Vice President and General Manager of Wallace-Murray's Eljer Division and told him he "felt confident there would be a price increase" on the bathtubs in question. Bonnett confirmed that Cannon reported the September 17 price discussions to him:
 
 
 34
 "Q. To the best of your recollection, Mr. Bonnett, what did Mr. Cannon tell you concerning these increased prices?
 
 
 35
 "A. To the effect that there was a general discussion, that higher prices were wanted and needed, by everyone, and that there was a tentative agreement to increase prices, tentative discussion. I couldn't say that there was a definite agreement by everyone, but prices were discussed."
 
 
 36
 In light of this evidence, and considerable other evidence in the record, we think the jury could have found that the October-November 1962 enameled cast iron bathtub price increases were the result of a price-fixing conspiracy. As to all appellants[1] except Decker (American Standard,[2] there was certainly sufficient evidence to go to the jury.
 
 
 The Agreement to Maintain and to Increase the Prices of Vitreous China Plumbing Fixture
 
 
 37
 The second goal of the conspiracy, the government asserted, was to maintain and ultimately to increase prices of vitreous china plumbing fixtures. It is undisputed that on January 14, 1963 Crane announced an approximately 7 per cent increase in published wholesaler net prices for all vitreous china plumbing fixtures and at the same time withdrew certain special discount prices on some high volume items. On January 23, 1963 American Standard increased both its wholesaler net prices and its special discount prices on vitreous china plumbing fixtures by about 7 per cent. Within a month thereafter, all[3] the other indicted manufacturers had substantially followed American Standards new prices, and Crane retroactively reinstituted special discount prices at the same higher level adopted by the other manufacturers. We think there was ample evidence for the jury to find that these price increases were the result of an illegal agreement.
 
 
 38
 Callanan (Rheem) testified, for example, that at the September 17, 1962 gathering in Quinn's room at the Sheraton-Chicago hotel:[4]
 
 
 39
 "* * * there was a discussion with regard to raising the prices of china on the Special Buying Opportunity [special discount price sheets] but it was felt that unless the short-line manufacturers increased their price, we couldn't get too far away from it."
 
 
 40
 He also related that he concluded at the time that the special discount prices in effect then would be maintained by the group:
 
 
 41
 "Q. What was decided with respect to the vitreous china staple prices on your Special Buying Opportunity of May 1962, which was the subject of discussion?
 
 
 42
 "The Court: If anything.
 
 
 43
 * * * * * *
 
 
 44
 "A. My opinion when I left the room was that there would be no change in staple prices in that Special Buying Opportunity [special discount price sheet]."
 
 
 45
 Callanan also testified that at the September 17 meeting "there was a feeling that there should be an across-the-board raise of some percentage to strengthen the china prices."
 
 
 46
 The evidence also indicates that top level representatives of the Enameled Cast Iron Industry Group of the PFMA met at the Shoreham Hotel in Washington, D. C. on November 20, 1962, the day after a special dinner meeting of the Enameled Cast Iron Industry Group in Washington. Robert J. Pierson, Vice-President for Marketing of Rheem's Home Products Division, testified that at this November 20 meeting he participated in a discussion regarding some proposed price increases with Quinn (American Standard), Held (Kohler), Kelch (Borg-Warner) and Casner (Crane). He said that Casner told the group his company had instructed him to raise prices and that they were going to certain levels in spite of what the industry might do. Pierson further testified that, at this point:
 
 
 47
 "There was a general discussion regarding each individual company's reaction to it. It was my opinion when I left that people probably would follow the lead of Crane in some form or another."
 
 
 48
 We have already pointed out that on January 14, 1963, Crane was the first defendant to announce an across-the-board 7 per cent increase for all china fixtures in its wholesaler net price book and that shortly thereafter all the other indicted corporations followed.
 
 
 49
 Charles Betz, who at the relevant time was Briggs' Sales Vice President, testified that in January 1963 he had a telephone conversation with Raymond A. Pape, a Crane official, concerning vitreous china prices and told him he "would certainly go along" with a sensible price increase "because these past price practices were very disastrous to our business." Moreover, Betz testified that, when Briggs subsequently increased its china prices, it was because of its competitors' actions and pursuant to his telephone conversation with Pape.
 
 
 50
 Government witnesses also established that, after the vitreous china increase had been effected by all defendants but Borg-Warner, there remained considerable doubt whether the new prices would remain in force. However, the evidence indicates that at a "special meeting" of the Enameled Cast Iron Industry Group of the PFMA at the Waldorf-Astoria in New York on February 7, 1963 several of the conspirators agreed to try to maintain the new prices. Decker and Quinn (American Standard), Held (Kohler), Kelch (Borg-Warner), Callanan (Rheem), Pape (Crane), Bonnett (Wallace-Murray), and Backner (Universal-Rundle) attended this special meeting. Bonnett testified that after the "formal" part of the meeting there was a "price discussion." He stated that he stayed for only a few minutes and then went to Quinn's room upstairs, and that Quinn told him he would come up later and report whatever transpired. Quinn arrived at 4:00 p. m. and they discussed the price decisions made at the meeting. With respect to the vitreous china price increase, Bonnett testified as follows:
 
 
 51
 "Q. Did you discuss with Mr. Quinn — did you tell him what Murray Corporation's intentions were with respect to the recent vitreous china increase?
 
 
 52
 * * * * * *
 
 
 53
 "A. We had published a new price and when we did, it was our intention to try to adhere to those prices to the best of our ability. So this would have been understood, that we would try to maintain any new prices that we had published.
 
 
 54
 * * * * * *
 
 
 55
 "Q. Did Mr. Quinn indicate to you at this time, in his hotel room, what the view of the people downstairs were in connection with the recent vitreous china increase?
 
 
 56
 "A. Well, the general consensus was that the new prices would — we would try to maintain the new prices."
 
 
 57
 Five days after Kelch (Borg-Warner) attended this February 7 meeting Borg-Warner also announced a 7 per cent across the board increase on china fixtures.
 
 
 58
 Thus in the light of the above and other substantial evidence in the record, we think a jury finding that vitreous china prices were fixed as a result of illegal agreements would be plainly justified. The evidence on this point against all appellants, except perhaps Decker, was sufficient to go to the jury.
 
 
 The Agreement to Limit Maximum Discounts From Wholesaler Net Prices
 
 
 59
 The third phase of the conspiracy, the government asserted, was an agreement to limit discounts on quotations on project or job work to a maximum of 15 per cent from wholesaler net prices on enameled cast iron fixtures and 20 per cent on china fixtures. We think there was sufficient evidence to justify a jury finding that the defendants illegally agreed to limit maximum discounts in violation of the Sherman Act.
 
 
 60
 Callanan testified that there was a discussion about job pricing and maximum discounts at the gathering in Quinn's room at the Sheraton-Chicago Hotel on September 1, 1962:[5]
 
 
 61
 "Q. What was the discussion that evening in Mr. Quinn's room concerning discounts from sheet prices, Mr. Callanan?
 
 
 62
 "A. I can't remember what the discussion was, but I came away with the opinion that discounts that I would be using would be 15 per cent on iron and 20 per cent on china.
 
 
 63
 "Q. What was your —
 
 
 64
 "The Court: That you alone would be doing that?
 
 
 65
 "A. I don't know what other people were doing.
 
 
 66
 * * * * * *
 
 
 67
 "The Court: All right. Then, you would do it. You came away with the opinion that only you would be doing what you said you would be doing?
 
 
 68
 "A. Oh, no.
 
 
 69
 "The Court: That is what we want to know. If it is that, say that.
 
 
 70
 "A. I was of the opinion that other people would be using the same structure.
 
 
 71
 "Q. What other people, sir?
 
 
 72
 "A. The other members who were in the room that evening.
 
 
 73
 "Q. And what figures were they?
 
 
 74
 "A. Fifteen per cent on iron and twenty per cent on china."
 
 
 75
 Moreover, Bonnett (Wallace-Murray), who had been upstairs in Quinn's room during the price discussions at the February 7, 1963 meeting at the Waldorf-Astoria[6] testified that Quinn in his report to him about the price discussion:
 
 
 76
 "* * * indicated there had been some discussions about discounts on plumbing fixtures, and to try to keep some semblance of reason, and that there was a tentative discussion or agreement not to go below a certain point."
 
 
 77
 Bonnett also stated that the specific discount limits discussed were 15 per cent on cast iron and 20 per cent on vitreous china. He further testified that he told Quinn "we would try to adhere to those discounts."
 
 
 78
 We think there was sufficient evidence in the record for the jury to find an illegal agreement to limit maximum discounts and that there was sufficient evidence against all appellants, except perhaps Decker, on this point.
 
 
 79
 
 The Agreement to Eliminate Regular Enameled Cast Iron Plumbing Fixtures and to Increase the Prices of Acid Resistant Fixtures
 
 
 
 80
 The fourth phase of the conspiracy alleged by the government was an agreement to discontinue the production of the lower priced line of regular enameled cast iron plumbing fixtures with the planned result of an increased price structure resulting from the changeover to all acid resistant enameled cast iron fixtures. Regular enameled fixtures, because of their lower price, constituted the defendants' largest selling line of enameled cast iron plumbing fixtures; regular enameled fixtures accounted for more than $20,000,000 in gross annual sales at American Standard alone. Nevertheless, beginning in early 1961 the industry began considering the possibility of making only the higher priced acid resistant fixtures "in response to the increasing competition from plastic fixtures and steel fixtures both of which were all acid-resisting." (Appellants' Joint Br. p. 24). On June 7, 1963, the Department of Commerce at the urging of the industry announced a revision of former Commercial Standard CS 77-56, effective July 10, 1963, and for the first time made acid resistant cast iron enamel fixtures the industry standard.
 
 
 81
 On July 1, 1963 American Standard announced its intention to discontinue production of regular enamel cast iron plumbing fixtures and it published revised prices on its acid resistant fixtures which were higher than those for the old regular enamel fixtures. Within two months, all the indicted producers of cast iron plumbing fixtures announced the discontinuation of regular enameled fixtures and published similar new prices for acid resistant fixtures. We think there was ample evidence to justify a jury finding that the changeover to all acid resistant fixtures with its concomitant new price schedule was the result of an agreement in violation of section 1 of the Sherman Act.
 
 
 82
 For example, there was evidence that acid resistant prices were agreed upon at a gathering after a meeting of the PFMA Enameled Cast Iron Industry Group at the Biltmore Hotel, Palm Beach, Florida, on March 28, 1963. Pierson (Rheem) testified that after the official meeting he met with Quinn and Decker (American Standard), Kelch (Borg-Warner), Held (Kohler), Casner (Crane), Callanan (Rheem), Balmer and Cannon (Wallace-Murray), Backner (Universal-Rundle) and possibly Pape (Crane) in Quinn's hotel room where they discussed the changeover and the new acid resistant prices. Pierson testified in part as follows:
 
 
 83
 "A. The discussion resolved [sic] around the specific time-table that would occur in this change from — in the elimination of regular enamel and the pricing schedule that would resolve as a result of this change.
 
 
 84
 "Q. Were specific prices mentioned during the course of this meeting?
 
 
 85
 "A. Yes.
 
 
 86
 "Q. Were specific prices mentioned for the 14-inch and the 16-inch bathtubs?
 
 
 87
 "A. Yes.
 
 
 88
 "Q. Were there any prices or any formulae presented at this meeting concerning small ware? That is lavatories?
 
 
 89
 "A. There was a plan, yes, a price schedule put forth.
 
 
 90
 * * * * * *
 
 
 91
 "Q. What was the formula put forth, sir?
 
 
 92
 "A. It was approximately as we have indicated the increase in our price schedule.
 
 
 93
 * * * * * *
 
 
 94
 "Q. What was decided at this meeting, if anything, Mr. Pierson?
 
 
 95
 "A. Well, as I said originally, there was a timetable established and a new pricing structure, which I felt was agreed by all those present." (emphasis added).
 
 
 96
 Pierson specifically recalled that appellant Held (Kohler) said that he was speaking for his company and that they would go along with the plan. He also stated that the entire group remained at the meeting until the price discussions were concluded. Callanan confirmed that there was a price discussion at this gathering and that a specific pricing structure was put forth. Cannon also testified that the "proper philosophy" of pricing in the new all acid resistant market was discussed at this gathering and that certain prices were decided upon.
 
 
 97
 There was also evidence that the new acid resistant prices were again discussed and the illegal agreement reaffirmed at a meeting at the Airport Hotel in Pittsburgh on May 15, 1963 attended by Decker and Quinn (American Standard), Held (Kohler), Kelch (Borg-Warner), Casner and Pape (Crane), Bonnett and Cannon (Wallace-Murray), Backner (Universal-Rundle), and Callanan (Rheem). Bonnett was asked at trial what was decided at the Airport Hotel meeting with respect to certain colored bathtub prices and responded:
 
 
 98
 "It's difficult to say whether a definite decision was reached on these prices, they were discussed by most of the people there but we certainly did not poll the group to say, `Would you do this, will you do that?' It was my understanding when I left the meeting that the prices would generally be on this level."
 
 
 99
 Pierson did not attend this meeting but testified that when his subordinate Callanan returned from the meeting he reported to him that it "was his opinion that the plan to phase out regular enamel and the price schedule proposed was going to go through."
 
 
 100
 Moreover, there was evidence that the illegal agreement was again discussed and reaffirmed at a meeting in Quinn's room at the Waldorf-Astoria Hotel in New York, on June 26, 1963 attended by appellants Decker, Quinn and Held, as well as Kelch, Casner, Pape, Balmer, Bonnett, Cannon, Pierson, Callanan and Backner. Pierson testified that at this meeting there was "a general review of the proposed plan on this [all acid resistant] product line and the pricing that was related thereto." Cannon testified that Quinn or Decker showed him a copy of the announcement American Standard was going to make concerning the changeover to all acid resistant fixtures and the new acid resistant prices; he further stated that this document was discussed by the group.
 
 
 101
 We think the overwhelming evidence on this phase of the conspiracy clearly warranted a jury finding that the changeover to all acid resistant fixtures and its concomitant price rise was the result of an illegal price-fixing conspiracy. Certainly there was sufficient evidence to support a jury finding against all appellants on this issue, including the appellant Decker. We think the evidence concerning events which transpired at three conspiratorial meetings he attended was certainly sufficient to support the jury verdict against him.[7]
 
 
 102
 JOINT ARGUMENTS.
 
 
 Partisan Participation by the Trial Judge
 
 
 103
 Appellants contend that they were denied a fair trial because of the district judge's excessive participation in the trial, although they disclaim any intent to charge personal hostility on his part. They "explain" his conduct by stating their belief that from the outset the judge was convinced of the appellants' guilt and thus viewed their conduct and that of their attorneys as designed either to be obstructive or to invite error.
 
 
 104
 The appellants have culled from the over 10,000 page trial transcript some three hundred incidents which they say illustrate the objectionable nature of the judge's conduct. They have broken these examples down into the following categories:
 
 
 105
 1. The trial judge's deprecation of appellants' evidence;
 
 
 106
 2. The trial judge's cross-examination of witnesses and other prosecutor-like intrusions;
 
 
 107
 3. The trial judge's abusive and belittling treatment of defense witnesses and counsel;
 
 
 108
 4. The trial judge's openly suspicious attitude toward defense counsel and witnesses;
 
 
 109
 5. The trial judge's contrasting treatment of the government.
 
 
 110
 We are completely satisfied that no one of the incidents relied upon by appellants deprived them of a fair trial. But appellants contend that the incidents were so pervasive and frequent that they cumulatively had that result. In order to evaluate this most serious charge an examination was made of each page of the trial transcript.
 
 
 111
 A reading of the many unrelated incidents selected from a jury trial lasting sixteen weeks gives a distorted impression of the judge's conduct. Many of the incidents relied on by appellants are nothing more than the typical rulings and comments found in any trial transcript. Others arise from the judge's understandable desire to keep the trial moving. Certainly the trial judge was testy on occasion and certainly the reasons given for some of his rulings left something to be desired. But all of this must be kept in perspective. This was a long trial and in great measure involved an exceedingly technical subject. Much of appellants' grievance is really directed at the correctness of the judge's evidentiary rulings which are matters for independent consideration. But in fairness to the judge it must be said that many of the objections of appellants' counsel were so lacking in substance or so repetitive that they deserved to be consistently overruled. Because of the number of these rulings, however, they could have created the false impression with appellants that judicial objectivity was lacking.
 
 
 112
 Our evaluation of the record leads us to conclude that the trial judge did not unduly deprecate appellants' evidence, that in their setting his questions to witnesses did not exceed proper bounds either in tenor or extent, that there was nothing approaching abuse either to defense witnesses or their counsel, that the trial judge did not portray an openly suspicious attitude toward defense counsel and witnesses, and finally, that there was none of the so-called contrasting treatment of the government which appellants claim demonstrates the trial judge's unfairness to them.
 
 
 Prosecutor Misconduct
 
 
 113
 Appellants advance numerous reasons why they were substantially prejudiced and denied a fair trial as a result of the improper and inflammatory conduct of the government attorneys. We shall consider them seriatum.
 
 
 114
 Appellants first assert that the prosecutor indulged in misleading and inflammatory cross-examination of appellant Norman Held (Kohler) concerning alleged unfair labor practices by Kohler prior to the indictment period. In his opening to the jury Kohler's counsel said:
 
 
 115
 "Now, the plant up in Kohler, Kohler Village, employs about four or five thousand people. It is the principal employer in the whole county. One way or the other the economy of the county depends upon full employment at Kohler. Kohler accepts that responsibility and has a philosophy to try to discharge it. It is a remarkable thing. There is a period in the 1930's and thereafter, you people, some of you people remember the 1930's and thereafter, a period of 17 years when not an employee of the Kohler Company lost a day's pay through layoff. In this decade the same thing has been true."
 
 
 116
 Over government objection Held was permitted to testify as follows:
 
 
 117
 "Q. And how large a town is Kohler and would you just describe it, please, the village of Kohler?
 
 
 118
 "A. That is just a small town of several thousand and it is just a little bit different from the usual factory type of town. It is a planned community and it is probably due to the fact that the Kohler family and the Kohler Company didn't want what might be termed a factory town and brought in town planners, architects and engineers with the result that it is rather a pretty little place with its own school system and its own governing body, the people that live there and with a high incidence of owner-owned homes.
 
 
 119
 "Q. People mostly own their own homes there, is that correct?
 
 
 120
 "A. Yes, sir.
 
 
 121
 * * * * * *
 
 
 122
 "Q. Mr. Held, could you give us a brief history of the Kohler Company, when it started to make plumbing fixtures, when it was started, and so forth?
 
 
 123
 "A. Yes, I think I can do that. The company had its start in 1873 when one Michael Kohler, an immigrant from Austria, started a manufacturing plant mostly castings in Sheboygan, Wisconsin. And at that time he produced farm tools, farm equipment, some things like iron drinking fountains and iron horse troughs and items similar to that, some ornamental things, too, that could be cast at the time. He did some castings in bronze or brass and steel tubes. However, about ten years later, 1883 or so, he began to get into enameled utensils and graduating into the enameled plumbing fixture business and then a new plant was needed, so around about 1900 or so, a new plant was constructed about three miles west of Sheboygan, Wisconsin, and this is the present site of the plant now and by that time, the primary product was plumbing fixtures, and at this time enameled cast iron plumbing fixtures. And about 1905, the son of John Michael Kohler, who passed away, Mr. Walter J. Kohler took over as president and from that time forth, the business grew and became emphatically a manufacturer of plumbing fixtures and began to grow and market its product more widely."
 
 
 124
 On cross-examination the prosecutor asked Held the following question:
 
 
 125
 "Q. Mr. Held, didn't you purposely leave out of your history of the Kohler Company the fact that between 1954 and 1960, Kohler had one of the longest and bitterest strikes in American history at the end of which Kohler Company was found by the National Labor Relations Board to have engaged in an illegal refusal to bargain in good faith and in other unfair labor practices?"
 
 
 126
 An objection was made by the attorney for American Standard. Nothing was said by Held's attorney. However, the attorney for Kohler addressed the court as follows: "If the Court please, I urge the Court not to sustain the objection. I would wish the witness to be allowed to answer." Whereupon the witness purported to explain in a rather oblique fashion his lack of reference to the strike. The prosecutor then asked additional questions which went into some detail concerning unfair labor practices found by the National Labor Relations Board,[8] eventually referring to Kohler's purchase of guns, ammunition and tear gas, eviction of strikers, investigating the private lives of union officials, and other inflammatory topics.
 
 
 127
 The emotional nature of some of the cross-examination on this subject matter may have tended to temporarily divert the jury from passing on the merits of the criminal charges, at least as to Kohler and Held. However, Kohler and Held invited some such inquiry by first attempting to create a picture of a completely beneficent employer. Moreover, the initial statement by Kohler's counsel, when a threshold objection was made to such cross-examination, "opened the door further." However, when Kohler's counsel later objected on the ground that the questioning had become inflammatory — by reference to Kohler's purchase of guns and tear gas, etc. — we think the judge should have terminated the line of questioning. We think its potential for prejudice outweighed its evidentiary value. We say this despite our realization that the witness never did permit a possibly less inflammatory development of the government's position because of a claimed lack of personal knowledge of events during the strike period although some of his favorable direct testimony concerning Kohler suffered from the same infirmity.
 
 
 128
 In the circumstances of this case, however, we are unable to find that the nature of the interrogation constituted reversible error even as to Kohler and Held. It was an incident involving two appellants. The time spent on it before the jury was minimal, perhaps one hour in a total of sixteen weeks. The trial proceeded for several weeks after the incident. At Kohler's request, the matter was not alluded to either in the summations or the charge. Considering these factors in their setting and in conjunction with the strength of the government's evidence on the criminal charge, we cannot find that this incident could have so affected the jury that a fair trial was denied appellants.
 
 
 129
 The appellants also accuse the prosecutor of using his opening statement to lead the jurors to believe they were victims of the alleged conspiracy.[9] The trial judge denied appellants' motion for a mistrial. We fully recognize that a prosecutor is required to maintain a high standard of conduct in the performance of his duties. In a proper case his conduct may require a mistrial. See United States v. Schartner, 426 F.2d 470 (3d Cir. 1970). But we think the prosecutor here was saying nothing which was not rather self-evident in view of the nature of the charge and the products involved.
 
 
 130
 Appellants further contend that the prosecutor appealed to jury bias by stating in his opening and closing remarks that the grand jury which returned the indictment was composed of local residents. Passing over the appellants' failure to object on this score, we think it lacks sufficient substance to warrant reversal either alone or in conjunction with other claimed errors. Indeed, defense counsel were not above indicating to the jury that appellants were represented by Pittsburgh counsel as opposed to the government's Washington representation.
 
 
 131
 Appellants next assert that the government intentionally adduced incriminating and/or impeaching evidence through improper and prejudicial examination of witnesses. Their first grievance under this heading relates to the government's use for refreshment purposes during cross-examination of appellants Quinn and Decker of certain tape recordings of alleged telephone conversations with defendants and third parties made by William Kramer.[10] It must be emphasized that the jury never was given an identification of the voices on the tape or told what was said. The issue reduces itself to whether the district court committed error by permitting the use of tapes and earphones in an attempt to refresh the witnesses' recollection rather than requiring the use of the transcript of the tapes. We think an exercise of discretion was involved and we cannot find an abuse of discretion under the circumstances of this case. United States v. McKeever, 271 F.2d 669 (2d Cir. 1959); see 3 Wigmore, Evidence § 765 (3d ed. 1940).
 
 
 132
 Appellants also charge the prosecuting attorneys with violation of their professional obligations of candor and fairness. We have examined the bases for this charge and find them to be without merit. It is obvious that in a case of this magnitude the prosecutor would slip on occasions or suffer from a faulty recollection of the evidence. Indeed, conflicting evaluation by counsel of the probative significance of evidentiary matter is often a significant aspect of a trial, even more so when it is a jury trial. We think the appellants' charges against the prosecution are lacking in substance.
 
 
 133
 Appellants' last objection is to some statements made in the prosecutor's closing although they did not move for a mistrial. Certainly the prosecutor did overstep the bounds of propriety in a few instances in the course of his five hour closing, particularly in appearing to personally vouch for the integrity of a government witness and in implying the existence of damaging evidence outside the record. But in our view the trial court, by the explicit instructions it gave the jury at both the government's and appellants' request, fairly corrected the matter. We do not view the prosecutorial aberrations as being so prejudicial to defendants that they were deprived of a fair trial. See United States v. Socony Vacuum Oil Co., 310 U.S. 150, 237, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).
 
 
 Evidentiary Rulings
 
 
 134
 Appellants argue they were prejudiced by certain rulings on government evidence. They first challenge the propriety of the admission of Government Exhibits 551 through 556 (HCA notes). As we have noted, the elimination of regular enamel products and the fixing of acid resistant enamel prices was the fourth alleged event in the criminal conspiracy charged by the government. A part of the government's evidence on this aspect of the conspiracy concerned events at an informal session after the PFMA meeting at the Palm Beach Biltmore on March 28, 1963. As evidence of the agreement to eliminate regular enamel and to fix acid resistant fixture prices, the government offered two documents. One was an American Standard worksheet entitled "Acid-Resisting Enamel Prices" dated March 1, 1963. The other consisted of six pages of undated and unsigned handwritten notes on the stationery of the Hotel Corporation of America (HCA notes), which echoed figures and statements on the American Standard price worksheet. The appellants claim the admission of the HCA notes was reversible error.
 
 
 135
 They first argue that the notes were inadequately identified in that there was insufficient evidence concerning their author for them to be admitted in evidence. The government's contention is that Raymond Pape, a Crane official, wrote the notes at the Palm Beach meeting. In support of their position, government counsel introduced a stipulation by all counsel that the HCA notes were found in Crane's files and were stapled together. The government also called a former secretary in Pape's department to make a lay handwriting identification of the notes.[11] She testified that she had done work for Pape and had been familiar with his handwriting "at times." She identified the handwriting on four of the six pages as resembling Pape's. She could not identify the writing on the two remaining pages.[12]
 
 
 136
 Appellants contend that since a substantial danger of a wrongful attribution of guilt existed if these documents were erroneously identified, no less than a "positive, unequivocal identification of the handwriting must be required." In fact the weight of authority requires only that a prima facie case of the alleged author's identity be established for the documents to be admitted. See generally 3 Wigmore, Evidence § 693 et seq. (1940); McCormick, Evidence § 189 (1954). The ultimate issue of their authorship and the probative weight to be afforded them is for the jury. We conclude upon a reading of the record that the requisite prima facie case as to the four pages identified by the secretary was established. Thus, we hold that the trial judge did not abuse his discretion in admitting them.
 
 
 137
 Two of the pages were admitted without any handwriting identification. The jury was instructed that these pages might be compared with the other four pages for handwriting similarities should the other four be determined to be Pape's. Appellants challenge the propriety of allowing the jury to make such a comparison. They assert that the standard for comparison — the four pages — must be "admitted or proved" to be genuine before they may be used for comparison purposes. They further assert that the evidence was insufficient for the trial judge to properly determine the genuineness of the handwriting on the four pages so that they could be used as a standard of comparison.
 
 
 138
 Where documents are admitted for purposes other than handwriting comparison, they may be used by the jury as a standard for handwriting comparison if the handwriting is admitted or proved to be that of the alleged author. Williams v. Conger, 125 U.S. 397, 411-415, 8 S.Ct. 933, 31 L.Ed. 778 (1888); cf. 28 U.S.C. § 1731. The vast weight of authority requires that the trial judge determine whether the genuineness of the handwriting on the documents to be used as the standard is sufficiently proved. E.g., United States v. Swan, 396 F.2d 883 (2d Cir. 1968); Citizens' Bank & Trust Co. of Middlesboro, Ky. v. Allen, 43 F.2d 549 (4th Cir. 1930); 7 Wigmore, Evidence § 2020 (1940). In those jurisdictions where the trial judge is required to make the initial determination of genuineness the courts have adopted differing standards of proof. We believe the proper standard requires that there be sufficient evidence so that a jury finding of genuineness would not be subject to reversal as against the weight of the evidence. See United States v. Swan, supra.
 
 
 139
 In view of the present state of the law as developed above, we are convinced that the trial judge, had he considered this question directly, could only have properly held that the four pages were appropriate for jury use as a handwriting standard.[13] We say this because the evidence supplied by the lay handwriting witness, a former Crane employee, in conjunction with the fact that the HCA notes were subpoenaed from Crane's PFMA file, were stapled together, and were internally consistent in content convince us that a jury finding that the four pages were in Pape's hand would be fairly supported by the evidence. Thus, we conclude the four pages were properly before the jury for use as a handwriting standard.
 
 
 140
 The appellants challenge the judge's instruction on the HCA notes in this connection as well. They contend that the instruction assumed that the four pages to be used as a handwriting standard were in Pape's hand when in fact that very issue was in dispute. We have read the instruction and do not find that it contains such an assumption.
 
 
 141
 The appellants' final argument concerning the admissibility of the HCA notes is that they were irrelevant and immaterial because the time, place, and circumstances of their making were not brought out. The notes reflected proposed prices for products which the American Standard worksheet contained. Some of the prices on the worksheet were crossed out or circled and changes were penciled in. The HCA notes were similarly marked to show these changes. Moreover, general policy statements written in pencil on the worksheet were also recorded in the HCA notes. Most convincing of all, however, is the fact that the American Standard proposed prices, which were reflected in the HCA notes found in Crane Company's files, were in some instances only tentative prices which were changed before their public announcement. The inescapable conclusion is that Crane Company had pre-knowledge of American Standard's proposed prices. Even without knowing the source of this information, that evidence would be relevant and material to the question whether a price-fixing conspiracy existed.
 
 
 142
 Appellants next assert that the court erred in permitting the government to lead witnesses in critical areas. They concede that the trial judge has a broad discretion but they assert in effect an abuse of discretion. Considering that the government's non-expert witnesses were defense oriented we cannot find from an examination of the record that the trial court abused its discretion. Indeed, we think the record is replete with answers by such witnesses establishing a foundation for the use of leading questions. Nor can we find, as appellants contend, that the "cross-examination" device was so employed by the government on its witnesses as to have an adverse effect on the reliability of their testimony. We also find without merit appellants' contention that by permitting government witnesses to testify in terms of impressions or conclusions in so-called critical areas, the trial judge substantially impaired their right of cross-examination.
 
 
 143
 Appellants also contend in a somewhat oblique fashion that the co-conspirator hearsay exception deprives them of their Sixth Amendment right of confrontation. We note, however, that a decision of this court holds that the Confrontation Clause ruling in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 426 (1968), did not invalidate the hearsay exception rule in conspiracy cases. Parness v. United States, 415 F.2d 346 (3rd Cir. 1969). This view has been adopted in other circuits. United States v. Lawler, 413 F.2d 622 (7th Cir. 1969); Campbell v. United States, 415 F.2d 356 (6th Cir. 1969). Moreover the United States Supreme Court held in 1924 that the conspiracy exception did not deny a defendant his right of confrontation. Delaney v. United States, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462 (1924).
 
 
 144
 Appellants have called our attention to California v. Green, 399 U.S. 149, 90 S. Ct. 1930, 26 L.Ed.2d 489 (1970), which they say supports their contention that use of the co-conspirator exception to the hearsay rule violates the Confrontation Clause. In Green the court held in a non-conspiracy criminal case that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." Although the Court stated that it had no occasion in Green "to map out a theory of the Confrontation Clause that would determine the validity of all such hearsay `exceptions' permitting the introduction of an absent declarant's statements," its opinion suggests the use in criminal cases of such exceptions to the hearsay rule will be subject to careful scrutiny by the Court.[14]
 
 
 145
 We do not find that Green alters our conclusion that we are bound by holdings that use of the co-conspirator exception does not violate the Confrontation Clause. Nevertheless, we have examined the record for hearsay declarations of nontestifying declarants. We have concluded that, even if the co-conspirator exception be deemed a violation of the Confrontation Clause where the declarant does not testify, the rule's application in the present case was harmless error under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
 
 
 146
 Appellants' specific claims of prejudice are sketchy and conclusory.[15] Basically, they complain that incriminating statements of Casner and Pape were introduced although neither appeared on the stand. Pape's "testimony," they say, "came in through hearsay testimony of Cannon and Schambach and through the HCA notes." Casner's "testimony," they say, came in through the hearsay statements of Pierson and Callanan.
 
 
 147
 We have specifically reviewed the testimony of Callanan, Cannon, Pierson and Schambach (Pape's subordinate at Crane), as well as the HCA notes, for statements attributed to Casner and Pape. We have also reviewed the testimony of the other government witnesses for statements attributed to nontestifying declarants. We have found surprisingly few such statements. Some of these statements are probably not hearsay at all;[16] that is, they are not "testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of the matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter."[17] McCormick, Evidence § 225, at 460 (1954). The HCA notes, for example, clearly were not offered for the truth of their contents and did not rest for their value upon the credibility of Pape or anyone else. See McCormick, supra, at 463-66.
 
 
 148
 The instances of true hearsay declarations by persons who did not take the stand amounted at best to a handful.[18] In any case, none of the statements attributed to nontestifying declarants was strongly incriminating. The sum of its weight was extremely small and insignificant when the record is considered as a whole. In light of the compelling strength of the government's case, we can say beyond a reasonable doubt, that the admission of hearsay statements of nontestifying declarants did not affect the outcome of the case. Chapman v. California, supra.
 
 
 149
 Appellants also assert that assuming the validity of the co-conspirator exception, the trial judge committed error in not requiring the government first to prove prima facie by the acts and declarations of each appellant the existence of the conspiracy and the participation therein by each appellant before admitting the acts and declarations of each conspirator against all appellants. This court is well aware of the danger of finding guilt by mere association which is inherent in a conspiracy trial involving numerous defendants. See the concurring opinion of Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790 (1949). However, we note that the trial judge was faced with a difficult order-of-proof problem because of the multi-step nature of the alleged conspiracy and because the government was not able at the very outset to show the requisite involvement of every defendant. The control of the order of proof was a matter within the discretion of the court. See Esco Corp. v. United States, 340 F.2d 1000, 1009 (9th Cir. 1965). We find no abuse of discretion in the trial judge's rulings on the admissibility of the hearsay evidence in this conspiracy case.
 
 
 150
 The appellants assert, however, that at the time the hearsay evidence was received the trial court erroneously refused to give cautionary instructions to the jury with respect to the limitations on the use of hearsay evidence. Assuming that such an instruction would have been desirable, we fail to find where the appellants requested such limitations at the pages of the transcript cited in their brief. In any event, by the time the first two government witnesses had finished testifying, a prima facie case of conspiracy had been made out involving all the defendants with the possible exception of appellant Decker who was later tied in.[19]
 
 
 151
 Appellants next contend that the government's evidence fatally varied from the one-count charge in the indictment. Appellants' position appears to be that the proof tended at best to show two or more separate conspiracies and thus a variance existed because only one conspiracy was charged. We think the short answer is that the evidence was consistent only with the existence of one overall conspiracy as described in the indictment. We say this because the separate means and methods were connected to each other not only by a common plan to affect prices in the plumbing fixture industry, but also by a substantial identity of each of the defendants and co-conspirators in agreeing to and carrying out the challenged price moves. Moreover, the evidence also showed that more than one phase of the conspiracy was frequently discussed at each of the conspiratorial meetings, especially at the initial September 17, 1962 meeting in Quinn's room at the Sheraton-Chicago Hotel. The fact that each defendant's proved participation may not have been identical to that of the others does not itself multiply the number of conspiracies.
 
 
 152
 Appellants also contend they were denied a fair trial because the trial judge erroneously excluded or limited their evidence. In furtherance of this contention, the appellants cite four specific evidentiary rulings by the trial judge which were allegedly erroneous.
 
 
 153
 1. The Beckman Charts. Through its expert economic witness Dr. Donald Beckman, Kohler offered 107 charts graphically representing Kohler economic data for the years 1960 through 1967. The trial court restricted Kohler's graphic economic evidence to the four year period covered by the indictment[20] on the theory that any economic evidence before or after the indictment period was irrelevant. We understand the trial judge's desire to avoid remote evidence in view of the magnitude of the trial and the potential for confusing the jury. However, we have no doubt that in this case evidence of the preceding two years and of the year following the end of the alleged conspiracy would not have suffered from that defect.
 
 
 154
 Appellants contend that they were substantially prejudiced by the trial court's temporal limitation because Dr. Beckman was unable to utilize all 107 of his charts. In fact, however, the trial judge indicated he would admit the charts if they were modified to reflect data limited to the indictment period and did admit those charts so modified. Thus, it is clear the trial court's ruling did not preclude the use of any charts and did not substantially harm the appellants' defense for that reason.
 
 
 155
 The appellants contend, however, that the charts as amended to reflect only the indictment period were much less convincing in support of Dr. Beckman's testimony than they would have been if admitted as originally constructed. Thus, they claim that the restriction on these charts substantially diluted the effect of Dr. Beckman's testimony. We cannot agree. Dr. Beckman testified at some length with the aid of those of his charts which were admitted. His testimony was forceful and direct and in view of his distinguished credentials as an economic expert could hardly have been easily dismissed by the trier of fact. His thesis in simple terms was that, based on the relevant economic indicia of competitiveness, Kohler's pricing activity could only be the result of competitive forces in the marketplace. The strength of Dr. Beckman's testimony is exemplified by the following quotation which is but one of several such statements he made during his testimony:
 
 
 156
 "So the conclusion that seemed to me inevitable was that no prudent businessman would do such thing unless he was forced to do it by economic forces, and if there had been an agreement, it certainly would not have been for the purpose of selling below costs and lowering the income of the company. So it [Kohler's pricing practice during the indictment period] had to be, in my judgment, a result of highly effective competition; in fact of vigorous competition." (N.T. 8951) (emphasis added)
 
 
 157
 In addition, those charts which were admitted strongly support Dr. Beckman's analysis of the indictment period. Moreover, his testimony dealt with economic data not shown on his modified charts so that the substance of the material excised by the trial court's ruling was supplied by his oral testimony. For these reasons we conclude that the temporal limitation imposed on Kohler's charts, while error, did not substantially harm either Kohler or the other appellants.
 
 
 158
 2. American Standard Field Reports. Appellants also assign as error the district court's refusal to admit American Standard's exhibits 60 to 104. These exhibits were characterized by an American Standard witness as memoranda and documents made up by American Standard's Pricing Service in the regular course of its functions in recording information from field offices with respect to competitive activity and prices offered by competitors. They were offered as business records, pursuant to 28 U.S.C. § 1732, to prove that American Standard and its competitors were not limiting discounts to customers as the indictment charged they had agreed to do. The district court refused to admit these exhibits for the truth of their contents as business records.
 
 
 159
 These exhibits were in the main based on information supplied by sources whose trustworthiness could not be ascertained from the documents themselves and was not established by oral testimony. Moreover, because the exhibits concerned transactions to which American Standard often was not a party, the normal presumption that a party keeps accurate records of its transactions is not available here. Because the regularity with which these records were kept does not tend to establish their accuracy, we believe the reasoning of the Ninth Circuit is particularly applicable here. In a landmark case in this area, the Ninth Circuit held that exhibits substantially similar to those offered here were not admissible as business records. Standard Oil Co. of California v. Moore, 251 F.2d 188, 212-217 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). Since we believe trustworthiness of the documents is the touchstone, we are not inclined to adopt the contrary reasoning of the Sixth Circuit in Continental Baking Co. v. United States, 281 F.2d 137, 148 (6th Cir. 1960). See Palmer v. Hoffman, 318 U.S. 109, 113-114, 63 S.Ct. 477, 87 L.Ed. 645 (1943). Thus we conclude the rejection of these exhibits as business records was proper.
 
 
 160
 Following the court's ruling, these exhibits were reoffered "as typical of the program or policy followed or the procedure followed by [American Standard] district managers throughout the United States." (T. 6051). The court again refused the exhibits. The basis for this ruling was that the exhibits were cumulative in that a similar exhibit had already been introduced to illustrate the testimony concerning American Standard's method of gathering this information. We agree the exhibits were properly excluded on this ground.
 
 
 161
 3. Kohler Exhibit 132. Appellants contend the trial court erroneously excluded this exhibit entitled "Some Examples of Competitive Quotations — 1963" which was offered to prove that Kohler and its competitors had not maintained maximum discount levels. The exhibit is a listing of over 600 specific job quotations during 1963 where Kohler quoted discounts which exceeded levels the government claimed the appellants had agreed to maintain. On voir dire it was established that some 2,000-2,500 quotations were made in 1963 and that these 600 odd examples listed in the exhibit were substantially all the quotations above the allegedly agreed upon maximum percentages. Yet the exhibit, by its title and contents, in no way revealed these facts. Thus, we agree with the government that the exhibit was to some extent misleading. On the other hand, the mere existence of a significant number of quotations exceeding the alleged maximum levels was relevant to the appellants' defense. While we might have ruled differently, however, we are not convinced the trial judge's exclusion of this exhibit in the form offered amounted to an abuse of discretion. Moreover, in view of the extensive defense testimony concerning the existence of these discounts, we believe the jury was to a large extent made aware of the appellants' proof on this point even without the exhibit.
 
 
 162
 4. The Commerce Department Letter. Kohler offered a multi-part exhibit containing a letter from an official of the Commerce Department to prove that the appellants had not misled that Department concerning the general acceptance of regular enamel products in the industry. The government claim was that the appellants had deceived the Commerce Department on this matter in furtherance of their alleged agreement to change the Commercial Standard. The letter was dated October 18, 1962 and arguably demonstrated that the Commerce Department at that date believed that regular enamel products were standard in the industry, which in appellants' view would tend to weaken the government's case on this issue.
 
 
 163
 The letter was objected to on the ground that it referred to other correspondence which was not part of the submission, and thus, in the government's view, was objectionable hearsay. The trial court rejected the exhibit on the independent ground that its admission would violate the best evidence rule. The court ruled that the author of the letter "is the best evidence here, not his letter." Understandably the government does not argue on appeal that either the hearsay or the best evidence theory justified exclusion of this letter. We are convinced from our reading of the record that the letter ought to have been admitted although its probative value was minimal. The hearsay objection is groundless and in our understanding the best evidence rule does not require the author of the document be produced if the original document is offered.
 
 
 164
 However, even though we conclude the court erroneously excluded this exhibit, we are not convinced that the prejudice suffered by the appellants was substantial.
 
 
 Jury Charge and Submission of the Case to the Jury
 
 
 165
 Appellants claim that they were substantially prejudiced by the trial court's conduct in connection with the preparation of his charge to the jury. Their first claim is that the court committed reversible error because it flatly refused to rule on each of their joint requests for points for charge. In fact the trial court did flatly refuse to rule on the original sixty-seven requests submitted by the appellants on the grounds they were too voluminous and general to be of any aid to him in preparing his charge. The government's requests were treated similarly. The appellants claim this refusal to rule on each of their requests so impeded counsels' preparations for argument to the jury that the appellants were denied effective assistance of counsel.
 
 
 166
 We note that the trial judge has broad discretion in ruling on points for charge. In this case appellants' points were prolix, imprecise, and often intertwined evidentiary assumptions with law in a highly partisan manner. Moreover, shortly after these requests were submitted the court informed counsel that he would give them a reasonable time to resubmit their requests in an acceptable form. Indeed supplemental requests were submitted and the trial judge ruled on them in substance. On this record, we conclude the trial judge did not abuse his discretion by refusing to rule on each of the appellants' initial requests. See 8 Moore's Federal Practice, Paragraphs 30.03 [1] and [2] (1969).
 
 
 167
 The appellants further contend that the trial court failed to accurately inform them of the contents of his charge and that they were substantially prejudiced in their arguments to the jury for this reason. We note that the judge did advise counsel at some length of the substance of the points on which he would charge. However, appellants still claim that they were harmed in this connection and point to three specific instances of the substantial prejudice they suffered because they remained uncertain as to the substance of his charge on some crucial points. First they claim that they argued to the jury that an acquittal was required if the jury found that several conspiracies existed rather than one continuing conspiracy as was charged in the indictment. They claim they were prejudiced because the government argued a different version of the law and the judge failed to charge on their separate conspiracies theory. As we indicated previously, this record could support a finding of no more than a single continuing conspiracy. Moreover, the trial court told the appellants that he would not charge on a multiple conspiracy theory. Thus, if the appellants actually believed they would get such a charge or were entitled to one, they were self-misled, not judicially. There was no error here.
 
 
 168
 Appellants' second contention in this regard is that the court's pre-charge uncertainty concerning whether it would charge that an agreement to eliminate a product was a per se violation of the Sherman Act caused them not to argue this point to the jury for fear of subsequent contradiction by the trial judge. In fact the trial judge indicated that while he had some reservations, he was inclined to charge along the lines requested by the appellants. Appellants never advised the judge that they required a definite ruling from him on this point in order to aid them in the preparation of their closing arguments to the jury. Indeed, counsel for Kohler did argue to the jury on this point as follows:
 
 
 169
 "[T]here is no dispute that there was a change made in the Commercial Standard * * * eliminating from the standard any reference to non-acid-resisting enamel ware, and that all * * * or substantially all of them announced to the public their intention to discontinue the manufacture of regular enamel plumbing fixtures.
 
 
 170
 "Now, there is no question that those events occurred. Although the government spent a good part of its case proving those facts, they are not in dispute and they are not illegal; not a single one of them is illegal in itself. In and of itself, it was perfectly lawful. * * *" (N.T. 9659-60) (emphasis added)
 
 
 171
 In these circumstances, we do not find that the trial judge committed error. Appellants also claim that the court failed to charge on this point and thus the jury could have convicted because they believed such an agreement, to eliminate a product, standing alone, was proof of guilt. A reference to the court's charge belies the claim that this matter was not satisfactorily covered in the charge.
 
 
 172
 The appellants' final contention is that they were harmed because the judge gave a "missing witness" charge although neither the government nor the appellants requested it. In view of the many allusions to "missing witnesses" by counsel for both sides in their closing arguments, we do not believe the judge abused his discretion by so charging.
 
 
 173
 In connection with the jury charge itself, the appellants claim five errors. First, they contend the trial judge failed to charge the jury with respect to the responsibility of an "acceptor" of the Commercial Standard. They claim they were substantially prejudiced because the jury was not made aware that the elimination of regular enamel products may have been occasioned by the general acceptance of the Commercial Standard rather than a conspiratorial agreement. In effect the appellants wanted a charge that acceptance of the Standard indicated an intention to follow it. The trial judge gave a lengthy charge concerning the Commercial Standard in which he dealt with the nature of the Standard and its legal effect. In view of the comprehensive charge on this matter, we find no merit in appellants' argument.
 
 
 174
 Second, appellants assert they were prejudiced by the trial judge's failure to charge that the jury should consider whether the appellants tried to conceal their activities in evaluating whether illegal agreements were made. Assuming such a charge would have been proper, we do not believe the trial judge abused his discretion by not giving this charge on a point of at best tangential significance.
 
 
 175
 Third, appellants contend that the judge failed to charge on their specific theories of the case, viz. (a) he did not state "the defendants' theory that the January, 1963, vitreous china price increase came about as a result of the direct order of the * * * chief executive officer of Crane Co., and the subsequent independent decisions of the defendants;" and (b) that "the discontinuance of the manufacture of regular enameled cast iron bathtubs and lavatories was the result of the independent acceptances by the defendants of the Commercial Standard and not of any illegal agreement." The judge's charge adequately covered these points in our view.[21]
 
 
 176
 Appellants' fourth contention with respect to the charge is that the court failed to accord any weight to appellants' economic evidence. In fact the court reviewed many of Dr. Beckman's conclusions and attributed them to the other appellants as well as Kohler. The appellants complain, however, that the judge unfairly charged on the permissible inferences to be drawn from pricing patterns. They contend that while he charged that similarity of pricing was some evidence of agreement though certainly not conclusive, he failed to charge that dissimilarity in pricing was some evidence of no agreement. While we agree with appellants that such a charge would be proper, in view of the court's lengthy review of Dr. Beckman's conclusions that Kohler's pricing established the absence of an agreement, we do not believe the court abused its discretion in this matter.
 
 
 177
 Appellants' final argument is that the trial judge erred in charging that "the things the defendants did and said at the time, may * * * be weightier than the things they say thereafter." And that "assertions of innocence by such officers may reflect partly legal as well as factual contentions." They claim this charge, in effect, negated the impact of the testimony of defense witnesses. Passing over the fact that the appellants apparently did not object to this charge, we find no error in giving this charge on this record. United States v. Chas. Pfizer & Co., 426 F.2d 32 (2d Cir.1970) is clearly distinguishable on its facts.
 
 
 178
 Appellants contend that they were prejudiced when the judge gave the indictment to the retiring jury without first deleting the names of those defendants who had pleaded nolo contendere. They allege this prejudice arose because the jury must necessarily have inferred that these persons and corporations had been convicted of the crime charged. Thus, they contend, those persons who were listed in the indictment which the defense did not call would be presumed by the jury to be unfavorable to the appellants. The court instructed the jury both at the very beginning of the trial and at some length during his charge that they were not to speculate concerning the guilt of co-conspirators not defendants then on trial but named in the indictment. We are convinced on this record that the appellants did not suffer substantial prejudice in this matter. We also decline to hold that the trial judge abused his discretion in allowing an unmodified version of the indictment to go to the jury, although we think the better procedure would have been to cover the names when defendants so requested.
 
 
 179
 Appellants' next claim is that they were denied a fair trial because the court gave the case to the jury on a Friday afternoon rather than on the following Monday. Their assertion that "the jury could only have concluded that it was required to reach a decision on Friday night * * * [and] must have inferred that the court was in a hurry to convict the defendants" is groundless. There is absolutely nothing in the record to suggest that the trial court conveyed to the jury a desire for a quick verdict.
 
 
 Brady v. Maryland and Jencks Act Claims
 
 
 180
 Appellants also contend that the government attorneys did not fulfill their obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215 (1963), and the Jencks Act, 18 U.S.C. § 3500, to furnish certain materials to them. Brady held that due process requires that the prosecution not suppress evidence favorable to an accused that is material either to guilt or to punishment; the Jencks Act provides that, after a government witness has testified on direct examination, the government must produce any statement of the witness in its possession "which relates to the subject matter as to which the witness has testified." The government maintains that it has no Brady material and that it has complied fully with its duties under the Jencks Act.
 
 
 181
 Appellants first assert that the failure of the government to disclose to them prior to trial the grand jury testimony of Raymond A. Pape constitutes a violation of the Brady rule. Pape was formerly Vice President and General Manager of defendant Crane's Plumbing, Heating, Air Conditioning Group. As we have indicated, he did not testify at trial and died shortly thereafter, on July 15, 1969. During the pendency of this appeal the government furnished his grand jury testimony to appellants and to this court. Appellants argue that Pape's grand jury testimony was Brady material because Pape denied before the grand jury that any price-fixing agreement was reached at the March 28, 1963 Palm Beach Biltmore meeting. They consider the government's arguing to the jury that the HCA notes were written evidence of the illegal agreement made at the Palm Beach meeting "as grave as the `deliberate deception of court and jury by the presentation of testimony known to be perjured.'"
 
 
 182
 We have carefully reviewed all of Pape's grand jury testimony, particularly those portions called to our attention by appellants and are convinced that the government did not violate Brady by not producing it prior to trial. We note that while Pape denied that any formal price-fixing agreement[22] was made at Palm Beach he did admit that he had discussed prices with competitors at PFMA meetings. He also admitted that at least two months prior to their public announcement he knew what the new acid-resistant prices would be because he "had verbal discussions so that [he] was fairly certain what the other people would do." Grand Jury N. T. 3842-47. Moreover, as to the HCA notes, Pape unequivocally admitted that they were in his handwriting, and stated that "apparently someone was telling me what American Standard was going to charge," and that he felt the figures on the notes "represent new prices that American Standard was going to charge when they came out with their acid resisting enamel." Grand Jury N.T. 3673-74. He further testified in part as follows about the HCA notes:
 
 
 183
 "On this stationery that includes the Palm Beach Hotel, and there are several hotels on here, the one that I had previously felt that it couldn't have been Palm Beach, but after reading these [refreshment] documents, I feel that this could very well have been that early where I got this detail. This is the one that I say was American-Standard because it has American-Standard's specific prices and the names of the American-Standard tub." Grand Jury N.T. 3844.
 
 
 184
 On the whole, Pape's grand jury testimony was extremely incriminating and we cannot say that it contains any material exculpatory evidence.
 
 
 185
 Appellants also assert that the government's failure to reveal the contents or existence of certain statements in its possession by William E. Kramer was a violation of Brady and the Jencks Act. Appellants first learned of the existence of these statements while this appeal was pending during the course of Kramer's deposition which was being taken in certain civil treble damage actions against the indicted plumbing fixture manufacturers. Believing that these statements might contain Brady or Jencks material, appellants filed a motion in this court seeking to compel the government to give them copies of these statements and to make them part of the record. By order of April 21, 1970 another panel of this court directed the government to produce the documents in question for in camera inspection by this panel. The government produced 16 documents pursuant to the April 21 order and represented that four other requested documents are not in its files and that it has no record that they ever were.
 
 
 186
 We have carefully examined all of the Kramer statements. Most of them contain material that is exceptionally damaging to defendants. We have found no material exculpatory evidence in any of the statements. Moreover, we do not believe that appellants' mere speculation about materials in the government's files requires the district court or this court under Brady to make the materials available for their inspection. The possibilities for abuse in such a procedure are manifest. Cf. United States v. Crisona, 416 F.2d 107, 116 (2d Cir. 1969), cert. denied, 397 U.S. 961, 90 S.Ct. 993, 25 L.Ed.2d 253 (1970); United States v. Evanchik, 413 F.2d 950, 952-953 (2d Cir. 1969); United States v. Harris, 409 F.2d 77, 80-81 (4th Cir.), cert. denied sub. nom., Venning v. United States, 396 U.S. 965, 90 S.Ct. 447, 24 L. Ed. 430 (1969). It follows that appellants' motion to have the Kramer statements produced to them must be denied.
 
 
 187
 Appellants also contend that the Kramer statements should have been produced at trial pursuant to the Jencks Act. They correctly point out, however, that "Mr. Kramer was called as the final prosecution witness at trial but was not asked any questions by the prosecutor concerning alleged price fixing and merely identifies briefly certain meetings of the PFMA."[23] He was not cross-examined by any of the appellants. His grand jury testimony and what the government represented to be his Jencks Act statements had been previously produced to appellants.
 
 
 188
 We have reviewed Kramer's trial testimony and have examined the Kramer statements with a view toward the application of the Jencks Act. Only one of the documents can be considered to "relate to the subject matter of the testimony of the witness." This document lists certain meetings of the PFMA, including three of the meetings the minutes of which Kramer identified on the stand. There is no conflict between the dates shown on the list and the minutes Kramer identified. Moreover, appellants at the time had copies of these minutes. Indeed, there was no dispute about the dates of the meetings in question at trial. Under these circumstances we are convinced that the government's failure to produce the document which related to Kramer's testimony was harmless error. See United States v. Kahaner, 317 F.2d 459, 473 (2d Cir.), cert. denied sub nom., Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963).
 
 SEPARATE APPEALS
 
 Daniel J. Quinn
 
 
 189
 The only argument raised by appellant Quinn in his separate brief is that the trial judge erred in refusing to permit his counsel to question him on direct examination about his health so that the jury could properly evaluate his demeanor. Quinn, who was 68 years old at the time of trial and in ill health, testified for two days on direct examination and seven days on cross-examination. Quinn asserts that to assist the jury in evaluating his demeanor and to take into account any effect his illness might have had on his demeanor, his counsel toward the close of direct examination asked him if he had ever been under a doctor's care for any serious health problem since his retirement. The court sustained the government's objection to the question, noting:
 
 
 190
 "I have observed the witness all the way through too. I find nothing here that shows other than a very good witness, one who is responsive, one who is alert and shows no signs of any conduct because of any physical impasse.
 
 
 191
 "This is a proper question presented to the court in the event only there is a conviction. But it is improper here because prejudice might outweigh the facts."
 
 
 192
 A trial judge in balancing the probative value of evidence against possible prejudicial effect is vested with broad discretion. The trial judge here observed the witness testify and concluded that the competing interests should be balanced in favor of excluding evidence of Quinn's poor health. On this record we cannot say that his ruling was an abuse of discretion.
 
 
 Joseph J. Decker
 
 
 193
 The only argument raised by appellant Decker is that the trial judge erred in refusing to grant his motion for judgment of acquittal. We have already indicated, however, that the evidence of Decker's participation in the fourth phase of the conspiracy, the price fixing concerning the changeover to all acid resistant fixtures, was strong and certainly sufficient to support the jury's verdict.
 
 
 Kohler Co. and Norman R. Held
 
 
 194
 Appellants Kohler and Held challenge the sufficiency of the evidence against them. We have already concluded that the evidence that Held participated in all four phases of the conspiracy was strong and certainly sufficient to support the jury's verdict. Kohler, however, argues that there was insufficient evidence to support a finding that any criminal activity of Held was done in the course of his employment with Kohler and within the scope of his authority. We disagree.
 
 
 195
 Kohler asserts that there was no evidence to support a finding that Held had authority to determine its prices. Kohler also emphasizes that it was against its rigid anti-fraternization policy for Held even to have social contact with its competitors. However, the government points out that Held was Kohler's sales manager and a director of the corporation. Moreover, even though Held testified that he had no actual authority to publish prices, he admitted that he was the official who recommended price changes to Kohler's chief executive and that he had unlimited authority over the company's discounting or "job pricing."
 
 
 196
 We think the jury could have found that Held's illegal actions were within the scope of his authority. There was testimony by Callanan that at one of the conspiratorial meetings Held claimed "that he was speaking for his company." It would also be reasonable to conclude that Held's authority to recommend prices enabled him to commit Kohler to the conspiracy. Since Kohler adopted the conspiratorial prices and Held participated in meetings at which those prices were agreed to, the jury could reasonably have concluded that Kohler's price moves were taken as a result of the conspiracy. Moreover, the fact that Held may have been acting contrary to his instructions about fraternizing with competitors could hardly negate an inference that he was motivated at least in part by a desire to serve Kohler, and thus acting in the course of his employment. See Restatement (Second) of Agency § 228 et seq.
 
 
 197
 Kohler also asserts that it was prejudiced by the court's charge on a corporation's responsibility for its agents' acts and by its refusal to admit certain evidence concerning the rigor of its antitrust compliance policy. Assuming it was error to reject certain of Kohler's evidence concerning its corporate policy of strict compliance with the antitrust laws, we do not think Kohler was prejudiced in any way. The evidence was of marginal relevance and substantially cumulative.
 
 
 198
 As to the agency instruction, Kohler contends in substance that the court failed to say that the jury had to find both that the agents' acts were within his authority and within the course of his employment, that is, performed with the intention of benefitting the employer. In fact, the jury was so instructed.
 
 The relevant instructions were as follows:
 
 199
 "A corporation, itself, cannot attend a meeting or make decisions; it must act through agents, such as its officers, directors and employees. In order for a corporation to be responsible for the acts or statements of one of its agents it is not necessary that the corporation specifically authorize the agent to commit the act or make the statement. A corporation is legally bound by the acts and statements of its agents done or made within the scope of their employment or their apparent authority. Acts within the scope of employment are acts done on behalf of a corporation and directly related to the performance of the type of duties the employee has general authority to perform. Apparent authority is the authority which outsiders could reasonably assume that the agent would have, judging from his position with the company, the responsibilities previously entrusted to him, and the circumstances surrounding his past conduct.
 
 
 200
 "When the act of the agent is within the scope of his employment or his apparent authority, the corporation is held legally responsible for it, although what he did may be contrary to his actual instructions and may be unlawful.
 
 
 201
 "If you conclude that an agent of a defendant corporation, acting on behalf of the corporation and within the scope of his employment or his apparent authority, engaged in a price-fixing conspiracy, then it is no defense that the corporation had instructed its employees orally or in writing to comply with the anti-trust laws and not to engage in price discussions with competitors."
 
 
 202
 Thus, the judge charged in substance that the corporation would be responsible if the agent acted "on behalf of the corporation and within the scope of his employment or his apparent authority." When this instruction is viewed in light of the judge's definitions of "scope of employment" and "apparent authority," it is clear that the agency charge was not erroneous. We also note that one of appellants' points for charge stated that a corporation is criminally liable for an agent's unlawful acts done "within the scope of his authority"; no mention was made of the "course-of-employment" or "on behalf of" element. Finally, we point out that Kohler's counsel did not comply with the requirement of F.R. Crim.Proc. 30 that, before the jury retires to consider its verdict, he state distinctly to the trial judge the matter in the charge to which he objects and the grounds of his objection. Kohler's counsel did not make the trial judge aware that he objected to the way these elements of corporate responsibility were presented and thereby give him a chance to conform his instruction to Kohler's wishes before the jury retired.
 
 
 203
 Kohler also asserts that the agency instruction was "oversimplified" because it "did not discuss the elements in the case which might aid the jury to determine whether anything done by Norman Held could have been done within the course of his employment by Kohler * * *." We hardly think that the judge's failure to review the evidence on this point with the jury would be error. Moreover, the judge did review some of Kohler's contentions on the agency point earlier in his charge.
 
 
 204
 Kohler's final criticism of the agency instruction is that it did not state that the jury must be satisfied beyond a reasonable doubt that the elements for corporate responsibility were present. This contention is without merit. Near the beginning of his charge, the trial judge made clear that a defendant can be found guilty only if the jury is satisfied beyond a reasonable doubt as to every essential element of the crime. The court was not required to reiterate the reasonable doubt requirement in the agency instruction. In any event, this claim was not called to the judge's attention in the Rule 30 colloquy.
 
 
 Borg-Warner Corporation
 
 
 205
 Borg-Warner argues in its separate brief that the evidence of its participation in the conspiracy was insufficient to support a conviction. We have already indicated our conclusion to the contrary; there was strong evidence that Borg-Warner participated in all four phases of the conspiracy.
 
 
 206
 Borg-Warner's other separate argument is that it was prejudiced in certain respects by errors in the court's charge. Its first argument deals with the "missing witness" instruction that was given. Near the beginning of his charge, the trial judge gave the standard instructions on the presumption of innocence. In part, he charged as follows:
 
 
 207
 "Since the burden is upon the prosecution to prove the accused guilty beyond a reasonable doubt of every essential element of the crime charged, a defendant has a right to rely upon failure of the prosecution to establish such proof. A defendant may also rely upon evidence brought out on cross examination of witnesses of the prosecution. The law never imposes upon a defendant in a criminal case the burden or duty of producing any evidence."
 
 
 208
 However, since in their closing arguments counsel for all the parties except Kohler urged the jury to draw inferences from the failure of an opposing party to call certain witnesses, the trial judge endeavored to provide general guidance to the jury in its consideration of such arguments by charging as follows:
 
 
 209
 "There have been some arguments here on the failure of a party to produce a witness or evidence, as the case may be. Where a party, without satisfactory explanation, fails to call a witness, who is known to that party, who has knowledge of material facts and whose interest or prejudice is in favor of such party, or would likely be in favor of such party, the inference is that his or her testimony would not sustain the contention of the party, if the witness were called. Also, where evidence which would be properly part of a case, is within the control of one party or the other, whose interest would naturally be to produce it, and without satisfactory explanation, the party fails to do so, the jury may draw an inference that the evidence would be unfavorable, if that evidence was presented at the trial. If the testimony of the witness or the evidence would be merely cumulative, these rules would not apply. So, too, where witnesses are callable and evidence producible by any party, these rules do not apply.
 
 
 210
 "Now, whether you apply these rules depends upon what you find the facts to be."
 
 
 211
 Borg-Warner questions the propriety of this charge. First, it suggests that "[t]he net effect of such an instruction was to say that the defendant should have come forward and proved its innocence" and thus the charge "directly conflicts with the presumption of innocence." The short answer to this claim is that a missing witness charge has long been accepted as appropriate even in criminal cases. See Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893). Indeed, the following passage from Graves was recently quoted with approval by this court in United States v. Restaino, 369 F.2d 544, 547 (3d Cir. 1966):
 
 
 212
 "The rule even in criminal cases is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." 150 U.S. at 121, 14 S.Ct. at 41.
 
 
 213
 Accord, Brown v. United States, 134 U. S.App.D.C. 269, 414 F.2d 1165, 1166 (1969).
 
 
 214
 Borg-Warner also argues that the missing witness charge should have contained specific references to those witnesses to whom it would be applicable and should have explained the prerequisites to its application more fully. On this record, however, we cannot say that the trial judge abused his discretion in charging as he did. Finally, Borg-Warner seems to suggest that the instruction could not be applied to it because unlike the other defendants, "[c]ounsel for Borg-Warner did not suggest to the jury that they should infer from the government's failure to call a particular witness that that witness's testimony would have been adverse." However, we note that it is entirely clear from the record that Borg-Warner's counsel did argue to the jury that the government did not call Borg-Warner employee, Ray Bair because his testimony would have been unfavorable.
 
 
 215
 Borg-Warner also argues that it was substantially prejudiced by the trial judge's incomplete statement of its "theory of the case" in his charge to the jury. In particular, Borg-Warner emphasizes[24] that the trial judge should have specifically instructed the jury that it was relying on the testimony of government witness Morris H. Vereeke, Borg-Warner's Sales Vice President, that no price at Borg-Warner was ever established as a result of any information obtained from price discussions with competitors. Initially, we have some doubt whether Borg-Warner's suggested instruction on this point was an accurate characterization of Mr. Vereeke's testimony. In any case, we believe that the trial judge did not abuse his discretion in selecting the evidence he commented upon in his charge. Moreover, Borg-Warner's counsel clearly emphasized his reliance on Mr. Vereeke's testimony in his lengthy summation to the jury.
 
 CONCLUSION
 
 216
 The government's evidence of price-fixing by the appellants was compelling. We note in conclusion that the government presented eyewitnesses and co-conspirators who clearly implicated appellants in the crime and largely corroborated one another. As to all appellants but Decker, we have concluded that there is strong evidence of their participation in all four phases of the conspiracy. When it is remembered that evidence of a defendant's participation in any one phase of the conspiracy was sufficient for a conviction under the one-count indictment, it becomes clear that the cumulative effect of the government's case was overwhelming. As to appellant Decker, there was clear and convincing evidence of his participation in the fourth phase of the conspiracy.
 
 
 217
 It is true that we have found errors in a few instances but appellants are not entitled to hindsight perfection. Whether the errors be viewed in isolation or cumulatively we are completely satisfied that they did not deprive appellants of a fair trial or operate to their substantial prejudice. On the contrary, we are satisfied from our examination of the record in its totality that the appellants received a fair trial and that their conviction was entirely warranted from the evidence.
 
 
 218
 The judgments of conviction will be affirmed.
 
 
 219
 ALDISERT, Circuit Judge, joins in this opinion insofar as it applies to the appellants, American Standard, Inc., in No. 18182; Borg-Warner Corporation in No. 18184; Joseph J. Decker, in No. 18185; and Daniel J. Quinn, in No. 18186.
 
 
 
 Notes:
 
 
 [1]
 Kohler contends that there was insufficient evidence of Held's authority to impose criminal liability on Kohler. We will discuss our conclusion to the contrary along with our consideration of the other arguments raised in the separate brief of appellants Kohler and Held
 
 
 [2]
 Decker argues that there was no evidence to justify a finding that he participated in any of the four phases of the conspiracy. The government, on the other hand, argues that there was sufficient evidence for the jury to conclude that Decker participated in all four phases. Since we are convinced of the sufficiency of the evidence (which will be discussed later) concerning Decker's participation in the fourth phase of the conspiracy, the price fixing concerning the changeover to all acid-resistant fixtures, and since that evidence alone is sufficient to support the jury verdict against Decker, we need not pass on the sufficiency of the evidence of his involvement in the first three phases
 
 
 [3]
 Borg-Warner increased its trade sheet prices on vitreous china plumbing fixtures by 7 per cent on February 12, 1963
 
 
 [4]
 As we have stated there was evidence that Quinn (American Standard), Held (Kohler), and Kelch (Borg-Warner) were among those present
 
 
 [5]
 See note 4, supra
 
 
 [6]
 Decker and Quinn (American Standard), Held (Kohler), Kelch (Borg-Warner), Callanan (Rheem), Pape (Crane), Bonnett (Wallace-Murray), and Backner (Universal-Rundle) attended the Waldorf-Astoria meeting
 
 
 [7]
 As the Supreme Court pointed out in United States v. Wise, 370 U.S. 405, 416, 82 S.Ct. 1354, 1361, 8 L.Ed.2d 590 (1962), "a corporate officer is subject to prosecution under § 1 of the Sherman Act whenever he knowingly participates in effecting the illegal contract, combination, or conspiracy — be he one who authorizes, orders, or helps perpetrate the crime * * *."
 In addition to the above evidence against Decker, we note the following facts: Decker was President of American Standard's Plumbing and Heating Division; Quinn was Vice President and testified that he had a close working relationship with Decker; and the evidence of the participation of American Standard and Quinn in all phases of the conspiracy was strong. In light of all this, we find no merit in Decker's claim that the case against him was too weak to go to the jury.
 
 
 [8]
 Appellants contend that the questions did not fairly state the findings of the National Labor Relations Board. We think the deviations are not of independent significance here
 
 
 [9]
 "Now, when the plumbing contractor gets it, he doesn't keep it. He sells it. To whom does he sell it? He sells it to you. He puts another price on top of it. So, if you have the manufacturers, as is the case here, agreeing to increase prices that they sell plumbing fixtures to their wholesalers, sooner or later you are going to be paying that increase, the public. Particularly, on those plumbing fixtures which were the heart and soul of this conspiracy."
 
 
 [10]
 Kramer was Executive Secretary of the PFMA
 
 
 [11]
 The government represents in its brief that although Pape himself was technically available to be called as a witness, he was not called to identify the HCA notes because of the precarious state of his health. Indeed, Pape filed a motion to quash the government's subpoena to him on this ground. Although his motion was denied, the trial judge indicated his intention to take all possible measures short of granting Pape's motion to protect him. Moreover, the government represented to the trial judge that it would avoid calling Pape if at all possible. Pape died of heart failure shortly after the trial ended
 
 
 [12]
 The witness testified as follows concerning each of the six pages:
 (1) GX-551: "As I remember, it looks as if it could be Mr. Pape's but I can't be sure right now."
 (2) GX-552: "[I]t resembles Mr. Pape's."
 (3) GX-553: "It looks like it could be Mr. Pape's."
 (4) GX-554: "There really isn't too much handwriting on here to say too much about it." * * * "I can't really say."
 (5) GX-555: "That appears to be Mr. Pape's."
 (6) GX-556: "I can't be sure about this one."
 
 
 [13]
 In view of our disposition of this issue, we need not decide at this time whether the requirement of an initial determination of genuineness by the trial judge ought to be eliminated and the question of genuineness both as to the standard and the other documents be left solely to the jury. Such a course has been suggested by some commentators. See Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Rules of Evidence for the United States District Courts and Magistrates, Article IX, Rule 9-01 (March 1969)
 
 
 [14]
 Mr. Justice Harlan, concurring inGreen, stated his conclusion that "the Confrontation Clause of the Sixth Amendment reaches no farther than to require the prosecution to produce all available witnesses whose declarations it seeks to use in a criminal trial." A Confrontation Clause challenge to the co-conspirator exception has been made in Evans v. Dutton, 400 F.2d 826 (5th Cir. 1968), prob. jur. noted, 393 U.S. 1076, 89 S.Ct. 862, 21 L.Ed.2d 770 (1969).
 
 
 [15]
 They have made little attempt to document their claim by specific page references to the record
 
 
 [16]
 E. g., N.T. 978 (J.A. 361a), 989 (J.A. 365a), 1008 (J.A. 368a), 2397 (J.A. 204a), 2469 (J.A. 214a), GX-518
 
 
 [17]
 "It does not follow that, because the words in question are those of a third person, they are necessarily hearsay. On the contrary, it happens in many cases that the very fact in controversy is whether such things were spoken, and not whether they are true." State v. Wentworth, 37 N.H. 196, 217 (1858), quoted in 6 Wigmore, Evidence § 1766, at 179 (1940)
 
 
 [18]
 E. g., N.T. 1928-29 (J.A. 190-91a), 2016-20 (J.A. 298-300), 2183 (J.A. 300)
 
 
 [19]
 We think the above discussion is also a complete answer to appellants' argument that they were denied the right to an individual determination of their guilt or innocence
 
 
 [20]
 In the interest of precision we note that the court ruled that the charts would conform to its temporal limitation if they included all of 1962 although the indictment charged the conspiracy started sometime in September of that year. In the interest of convenience we shall refer to the time period contemplated by the court's ruling as the "indictment period."
 
 
 [21]
 He charged that the appellants contended:
 "That economic conditions dictated the prices which they charged and even if there was uniformity with other competitors' prices * * * such prices were the result of market forces and not the result of agreement."
 He further charged that the appellants contended:
 "That American Standard sought the changeover from regular enamel to acid-resisting enamel by means of the Commercial Standard, legally, as advised by counsel." (J.A. 1942a)
 Similar instructions were given for Held and Kohler (J.A. 1944a), and BorgWarner's contention that it was factually distinguishable from the other defendants on this issue was explicitly noted as well (J.A. 1945a).
 
 
 [22]
 It should be pointed out that his denials seem in part to be based on an erroneous view of the law of conspiracy. See, e. g., Grand Jury N.T. 3830:
 "* * * I can't picture or remember anybody agreeing. I would say that I had the general idea when we left the meeting that these were the prices. Now, that is sort of the indirect feeling of an agreement, but I can't picture everybody just saying it. But I would say that my feeling leaving the meeting was that these were the prices."
 
 
 [23]
 Appellants' Response and Appendix to Government's Motion to Show Cause, p. 34a
 
 
 [24]
 This is the only argument on this point raised by counsel for Borg-Warner in his post-charge colloquy with the trial judge. See F.R.Crim.Proc. 30
 
 
 
 220
 ALDISERT, Circuit Judge, dissenting in Appeal Numbers 18183 and 18187.
 
 
 221
 I would grant a new trial to Kohler Company, Appellant in No. 18183, and Norman R. Held, Appellant in No. 18187, because of what I consider improper and inflammatory conduct by the government attorney in the cross-examination of witness Held. This was fairly described in the majority opinion as references to "Kohler's purchase of guns, ammunition and tear gas, eviction of strikers, investigating the private lives of union officials, and other inflammatory topics."
 
 
 222
 The majority admit that "its potential for prejudice outweighed its evidentiary value," but conclude that because this incident occupied only one hour's time in a total of sixteen weeks it could not have affected the jury so as to deny a fair trial to these appellants. I disagree. I consider the improper cross-examination to possess a more sinister capacity.
 
 
 223
 Admittedly, what is posed is a close question. My brethren and I are in disagreement only as to where we place this error. I believe that it crosses the line and becomes so prejudicial as to justify the ordering of a new trial for these two defendants.
 
 
 224
 Even viewed from the most charitable vantage point, there was scant justification for the type of cross-examination persisted in by the government and permitted to continue by the trial judge over the concerted objection of all defense counsel. Its ostensible claim to legitimacy, according to the trial judge, stemmed from a challenge to the credibility of the witness Held. But even here, it is most difficult, if indeed at all possible, to localize the specific statements in his brief rendition of the Kohler history which form the basis for the prolonged attack.
 
 
 225
 On direct examination he described early Kohler history, an account that ended in 1905. In response to the first question on cross-examination relating to the company's labor relations policies, he stated — and this is not challenged — that he was not in Kohler, Wisconsin, from 1954 to 1960, the years of the strike there. Yet he was subjected to a continuing barrage of "did-you-know" questions relating to a bitter chapter in industrial warfare, the facts of which, concededly irrelevant to the substantive issues of antitrust violation, were never presented testimonially other than from the questions of government counsel, and all of which had an explosive capacity for inflamming a Pittsburgh, Pennsylvania, jury.
 
 
 226
 Moreover, an examination of excerpts of this cross-examination set forth in the margin[1] discloses that it concludes with the astonishing statement of the government attorney: "And you understand * * * that the questions which I have directed to you have absolutely nothing to do with any charge of the indictment that you have violated the law between 1962 and 1966?"
 
 
 227
 For the government to perpetrate and prolongate this slashing examination and then say that it had "absolutely nothing to do with any charge of the indictment" raises the serious question of the very real purpose of the examination. It is particularly significant that the trial was held in the Western District of Pennsylvania, a community historically and currently the center of organized labor activity. With a jury drawn from this philosophical environment, the potential for prejudice following an hour long injection of collateral labor-baiting activities into an antitrust prosecution cannot be minimized.
 
 
 228
 My difference with the majority going only to the effect of this admittedly improper cross-examination it does not become necessary to rehearse at length the appropriate principles of law.
 
 
 229
 I have concluded that the examination was designed to and did create an abhorrent image of these appellants, United States v. Beno, 324 F.2d 582 (2 Cir. 1963), and did degrade them in the eyes of the jury, United States v. Provoo, 215 F.2d 531 (2 Cir. 1954).
 
 
 230
 Traditionally, this circuit has been most zealous in prohibiting the introduction of collateral matters in a criminal prosecution. In United States v. Jacangelo, 281 F.2d 574 (3 Cir. 1960), Judge Hastie declared that "admission of evidence of involvement in other crimes was intrinsically inadmissible as highly prejudicial information about a collateral matter not connected with the offense charged." In our recent case of United States v. Shartner, 426 F.2d 470 (3 Cir, 1970), passing reference to the defendant's criminal record was held not to be reversible error solely because "it was not emphasized and was in a sense oblique." We said: "With this we are in accord albeit somewhat reluctantly. But the prosecuting attorney should not have been permitted to read that portion of the statement proving Shartner's prior conviction and the Trial Judge should have prevented such an occurrence. If it were not for the peculiar circumstances surrounding this incident we would hold it to be reversible error."
 
 
 231
 I believe that an improper cross-examination of at least one hour's duration, which persisted beyond an overnight recess, must be considered as more than an oblique reference — irrespective of the length of the trial.
 
 
 232
 Because I would remand for a new trial as to them, I would also hold that the Beckman charts supporting the oral testimony of Dr. Donald Beckman should be admitted, as well as Kohler Exhibit 132.
 
 
 
 Notes:
 
 
 [1]
 
 Q. How were they between 1954 and 1960, Mr. Held?
 A. Well, first of all, I can't answer firsthand 1954 to 1960, because I was not on the scene.
 Q. Mr. Held, I asked you a question. Is it not a fact, sir, between 1954 and 1960 Kohler Company engaged in one of the longest and bitterest strikes in American history?
 A. Well, I wouldn't characterize it that way. I will agree with the length, but I won't agree with the bitter. Also involved here was an auto workers union which had a contract that was geared to the production of automobiles. We are bathtub producers, that type of contract wouldn't work.
 Q. Then, you have no reason to buy guns and ammunition, do you, to break a strike?
 A. I don't know of any guns or ammunition.
 Q. Oh, you didn't know, sir, that during the course of the National Labor Relations Board hearings that Kohler Company was denounced for preparing for bargaining during the strike by purchasing guns, ammunition and tear gas?
 * * * * *
 A. Of my own knowledge, sir, I did not know.
 * * * * *
 Q. Do you know, sir, that in 1960 the National Labor Relations Board denounced your company for a number of unfair practices and that these practices included paying for and accepting from private detective agencies certain reports suggesting the possibility of bugging the union's hotel rooms during the course of the National Labor Relations Board hearing?
 A. No, sir.
 * * * * *
 Q. Are you aware, sir, that in 1960 the National Labor Relations Board criticized Kohler Company for such practices among which were paying for and accepting from private detectives certain telephone checks and long distance calls from union headquarters?
 A. No, I am not.
 Q. Are you aware, sir, in the same hearing in 1960, that the same National Labor Relations Board denounced Kohler Company for hiring private detectives in that they investigated into the private life of the union's chief negotiator, together with the investigation of three international union officials?
 * * * * *
 Q. Mr. Held, did I not ask you more than ten minutes ago whether or not you read the hearings and the opinion of the National Labor Relations Board, and did you not answer, "Yes, but that was a long time ago"?
 * * * * *
 Q. Certainly, sir. In the same 1960 opinion of the National Labor Relations Board, are you aware, sir, that, in their opinion, criticism was leveled against Kohler Company because of the submission of a formal detailed plan calling, in part, for a system of secret plant informants and a comprehensive investigation of all new employees?
 A. No, I am not aware of that.
 * * * * *
 Q. Do you know, sir, whether or not the United States Court of Appeals found that Kohler Company engaged in anti-union espionage during the strike? A. I don't know. I can't answer that without reference.
 The chambers conference was then held at which time the court was advised by counsel, "The course of inquiry which the government has chosen to pursue into this matter has not been into a logical examination of what probative value, if any, this matter might arguably have. But, it has been to select certain fragmentary details from the reported decisions of the National Labor Relations Board, and by the Court of Appeals for the District of Columbia, about the various legal proceedings which resulted from that strike, and to take those details which are most likely to inflame and prejudice the jury, and to make it impossible for them to act in a calm and dispassionate manner with respect to the issues in this case." After a lengthy chambers conference represented by twenty-one pages of the court record, the government attorney resumed the cross-examination the next day:
 Q. You will recall yesterday afternoon that you were asked certain questions concerning Kohler's strike which occurred between 1954 and 1960. Do you recall that sir?
 A. Yes, sir.
 Q. Did Kohler, as a company, ever own any of the homes in which the workers lived?
 A. On occasions for short periods of time, as I recall. I would have definite information on that, Mr. Fricano [government counsel].
 * * * * *
 Q. And when the strike occurred, sir, Kohler Company served eviction notices on the strikers, didn't it, and actually evicted some of them from company-owned houses and from the hotel?
 The cross-examination continued for ten additional pages of court record until the final statement by government counsel:
 Q. And you understand, of course, do you not, Mr. Held, that the questions which I have directed to you along these lines have absolutely nothing to do with any charge in the indictment that you violated the law between 1962 and 1966?